15-1015 Chesapeake Climate Action Network et al. Petitioners v. Environmental Protection Agency We would like this for the petitioners in the green field for their response. Good morning. May it please the Court, my name is Patton Dykus and I represent petitioners. I would like to reserve three minutes for rebuttal. For an extra four hours every time power plants start up, EPA has given them the option to be subject to work practice standards instead of numeric limits for deadly hazardous air pollutants. EPA based this extended work practice period on a technical analysis concluding that the best performing power plants cannot engage their pollution controls and thus, EPA found, cannot measure their emissions until four hours after electricity generation. But EPA didn't allow the public to comment on this technical analysis or this finding. And then the agency denied reconsideration on petitioners' objection that the analysis identified the wrong best performers. This morning I'd like to first address why EPA was wrong to deny reconsideration and then discuss why the exhaustion bar does not apply to our claim regarding the conflict of the acid rain. Can I ask a couple of housekeeping questions? Sure. So do you agree that the petition in numbers 16, 11, 69 can be dismissed? You're not pursuing that any further? I would have to look back at the case numbers, but I'm pretty sure if that's the one dealing with EPA's technical corrections to the start up rule or to the market air taxes. That is 06, 2016. I'm pretty positive that is the case. And does any entity beyond Sierra Club have standing here? We only included a declaration from Sierra Club in our reply brief. I think the answer is I'm not 100% sure. I can't say one way or the other, but we have established without a doubt that Sierra Club has standing and only one of the parties has to have standing under this court's case law. All right. I'd like to first address two reasons why petitioners meet the first prong of the statutory test for reconsideration. First, petitioners could not have objected to a best performer analysis that did not exist during the comment period. There's no dispute that EPA's proposals included no best performer analysis. When commenting, petitioners couldn't have possibly guessed which units EPA would later pick as best performers or that its selection would be so flawed. Nor do petitioners have any obligation to make such a guess under this court's case law, since doing so would require them to divine the agency's unspoken faults. A second independent reason that petitioners meet the first prong of the statutory test reconsideration is that EPA's proposed technical analysis didn't even speak to measurability. If we agreed with you on the first but not on the second, would we remand and all of it would be up for grabs in the agency? Yes. So we only have to consider one of your two objections. Is that right? For the first prong, yes, that is correct. Oh. Well, go ahead. Sorry. And if we were to agree with you on the denial of reconsideration, is there any reason for us to reach the arbitrary and capricious challenge? I don't think so. If the entire start-up period was remanded to EPA. Well, can we anyway? Would we even have jurisdiction? Wouldn't there be a petition for reconsideration pending? So we would not have jurisdiction, would we? As to the arbitrary and capricious thing? Right. I think that's probably correct. Right. And just so I understand, suppose we agreed that the objection you're now talking about, that is, that the best performance, that the best performance analysis, that the agency does have to reconsider that. Does that open up the whole record or just that when it goes back? It would be our position that that opens up the entire start-up period. So then we don't have to consider your other, the other argument you make about why you're entitled to reconsideration, right? I'm not sure I completely understand your question. Are you talking about the two arguments as to the first problem? No, I'm talking about the second argument, the argument that the agency failed to give notice to the fact that it couldn't, that ETUs could not measure emissions without having the pollution control technology operational. In other words, I think that he's referring to the data and methodology part of it rather than the best performers part of it. And I think that it took your answer to be that if we found that there was a failure to allow comment on the best performers because they didn't even identify them, that the issue about the data and technology would also be open on reconsideration. As to measurability, you mean? Yes. Yes, the two are bound together. Yes. But you were also going to talk about central relevance. Yes, of course. Yes. Petitioner's objections are of central relevance to the outcome of the rule because they go to the heart of whether the extended work practice period is lawful. EPA, Section 112H of the Clean Air Act requires EPA to make a very specific finding that sources can't measure their emissions before establishing work practice standards in lieu of numerical limits. And is that how you distinguish our decision in Sierra Club, which dealt with the industrial boilers, where we found that work practice alternatives to measurability were permissible because they couldn't measure? Here you're saying, well, they can because of the acid rain program? No. So how do you distinguish our decision in Sierra Club, our industrial boilers decision? Well, that case didn't consider either of the claims at issue here. It didn't consider reconsideration. It didn't consider the acid rain argument. The only claim it considered related to the technical analysis for power plants was a claim that it relied on when sources might choose to engage controls that theoretically sources might be able to do so earlier. But neither of the claims here is that claim. EPA's measurement finding, which it had to make, its core threshold finding, it had to make under 112A to the Act before establishing work practice standards. That is based on its selection of best performers as to nitrogen oxide and sulfur dioxide controls. And petitioners' objection calls into question that selection. Petitioners objected that EPA picked the wrong best performers, that the actual best performers can engage their sulfur dioxide controls at electricity generation. This Court's case is dealing with maximum achievable control technology rules that make clear that EPA's best performer analysis, when EPA considers the wrong best performers, that's of central relevance to the outcome. Those cases, several of which we cite in our reply brief, have remanded rules to EPA where the agency failed to consider the actual set of best performers. Now, EPA's attorneys argue that nitrogen oxide controls alone were the driver in establishing the extended work practice period, but that claim is found nowhere in the record and is, in fact, completely contrary to the record. For example, at JA 195-96, plainly shows that EPA found the best performers for nitrogen oxide controls and the best performers for sulfur dioxide controls engaged those controls at four hours after generation. If there are no further questions, I'll move. No? Okay. Thank you. May it please the Court. My name is Megan Greenfield, and I'm here on behalf of EPA. With me at counsel's table is Paul Versace from EPA's Office of General Counsel and Grady Moore on behalf of Industry Interveners. This Court should deny the petition for review. The startup shutdown rule challenged here mirrors the rule that this Court upheld last year in Sierra Club v. EPA. The two rules are substantively identical in all relevant respects. Both rules define the end of this... Wait, but why don't you address their argument that they were entitled to reconsideration on two different issues? That's the issue before us, isn't it? Yes. Okay. Why don't you focus on that? To obtain reconsideration under this provision of the Clean Air Act, the petitioners must show that their objection is of central relevance to the final rule and that it was impracticable to raise it sooner. On central relevance, petitioners argue that EPA should have selected a different group of power plants as the best performing. They identify 150 power plants they say are better performing because they have lower SO2 emissions during this early period of operation. But that's essentially a challenge to EPA's methodology here. EPA did not look in the proposed rule, the proposed 2013 rule, or in the final rule to which boilers had the lowest emissions because it does not believe that emissions, HAP emissions measurements are feasible during this period. It instead looked to when air pollution control devices were engaged. And it figured this out not by looking to emissions levels but looking to a drop in emissions of both SO2 and NOx. It was this drop below a set threshold that EPA found meaningful because it was at that point that EPA believes that smokestack conditions stabilize and measurements are feasible. Could you just explain something to me about that? I just, it's a technical question. Sure. Why is it that emissions can't be measured until the pollution control technology is operational? EPA is using the operation of the control technology as a proxy for when it believes smokestack conditions stabilize. And so for certain types... But you didn't answer my question. I don't think. I thought the agency's position was that until the technology is operational, emissions can't be measured. Isn't that their position? That is their position, but the... Why is that though? The pollution control technology limits the emissions, correct? It limits the emissions. But measuring emissions is a different function, isn't it? Yes, they are a different function. So why does the agency need the pollution control technology to be functioning efficiently before it can measure emissions? I just don't understand that. Sure, it's not a direct connection. Well, that's why I asked you the question. Right, right. I mean, it just doesn't make sense to me. What EPA found in its technical analysis is that it was the functioning of the pollution control devices that indicated when emissions were stable in the smokestack. I understand that. And it was at that juncture. I'll try once more. Sure. In my house, I have a furnace and a thermometer that... a thermostat. The furnace heats the house, but the temperature is measured by a different device. I don't need the furnace on to measure the temperature in the house. Is this different from that? In one respect, it is different, and that is for certain types of the measurements that need to be taken. This is a smokestack. When they're physically taking the smokestack measurements, which is one type of measurement that's possible here, it requires stable emissions. If the boiler and the emissions are in a state of flux, that kind of smokestack measurement is not effective or reliable. So there is a connection there. Okay. All right. So, Ms. Greenfield, you were saying that EPA looked to the drop in emissions as the factor that drove its choice of the best performers, but was that set out before the commenters so that they could have a crack at it? Yes. In the 2013 proposed technical support document, EPA explained its methodological approach here, which was looking to the drop of SO2 and NOx emissions levels as an indicator of when air pollution control devices were functioning and HABA measurements were feasible. So that's clear in the 2013 proposed technical support document, and I can give you JA references for that. So it said we're basing the period based on the amount of time needed to control emissions with air pollution control devices. Which page are you on? So this is JA 71. And then again at JA 89, the agency says what we're looking at is the time to achieve operating benchmarks, or what's called steady state operations. And then at JA 72 to 73, the agency explains clearly that it is not looking to overall emissions levels, but just this drop in emissions as the indicator of when air pollution control devices are functioning. And so at JA 72 in full, the agency says it's the removal efficacy of the air pollution control devices as evidenced by our emissions rates well below uncontrolled levels that may be used as an indicator of the end of the startup period. And that's the exact same approach that EPA followed in the final technical support document, where they, too, looked to this drop in emissions to indicate when the startup period ended. And there is a change. So I acknowledge that in the 2013 technical support document, EPA did not identify which boilers were the best performers. But EPA made that change from all boilers to the 12 percent best performing boilers in direct response to petitioners' own comments. Well, they say that's not what their comment was about. So we respectfully disagree. Why? Because their comment at JA 156 and at 162 to 63, this is EPA's discussion of it, they talk about stack testing being feasible at an earlier point, and then again they ask that it should be based on the best performing 12 percent. That's what EPA's analysis should focus on. That's at JA 176. And that's exactly what EPA did in the final rule, is that it looked at which, applying the methodology that it did in the 2013 technical support document, applying that same methodology, it selected the best performing boilers under that methodology in direct response to their own comments. And what petitioners want here is a different methodology entirely. They want EPA to focus on lowest emissions. But again, in EPA's technical judgment, it doesn't think that those emissions measurements are reliable at that juncture, and so that should not be the proper framework. Whether they're reliable or not, though, I took Judge Tatel to be asking why does that matter if there are large emissions that are irregular but nonetheless substantial during a startup period, and they can be measured, then in terms of taking account of what these plants are emitting, why does it matter whether they can be controlled? They're still going into the atmosphere. So I think that there's a disconnect here, and I don't think we're effectively addressing it. And EPA, it does not believe that in those early hours of operation when the boiler is just getting up, starting up, that the measurements that are being taken by the SEMs are reliable, that they actually mean what they say. So that's why EPA said under 112, when measurements are not feasible, when reliable measurements are not feasible, we can establish a work practice standard. That's exactly the same thing that happened in the Sierra Club case. And so we acknowledge that the SEMs are reporting numbers. We just don't think that those numbers are meaningful until the boiler reaches steady-state operations. And why would that be? I mean, if I just to vastly oversimplify, if I have a filter on my machine that's going to take out dangerous substances, but I can't put that filter on right away, and I also have, like, a measuring balloon around the whole thing that can tell me how much is coming out, and the measuring balloon is saying, well, there's a lot when you don't have your filter on, and then there's less when you have your filter on. Can you tell us more about why the measurement is not reliable? Like, what's the – I think this was – I think this is where Judge Taylor's question was coming from. Yes, that's my question. Why does the inability to put on the emission control technology affect the reliability of the measurements that you have if they're coming from two different sources of information? Exactly. And there is not a direct connection. Wait, wait. What do you mean, exactly? Right. There's not a direct connection yet. What's the question? Yet, you're saying. So there's not a direct connection. EPA was just using the air pollution control devices, those being operational, as an indication of the boiler achieving steady-state operations. Right. But why is a non-steady – I guess, more directly, why is a non-steady-state boiler emissions not reliably measurable? Can you give us more feel for what that's about? Sure. And that's because the way that these devices are designed is they're designed only to reliably measure emissions when that steady-state operations occurs. And I can point you to some spots. Wait, you mean the pollution control technology is designed that way, right? No, you're saying the measurement technology is. I'm saying the measurement technology works well only when the boiler is fully functioning. Not during this startup period. And where does it say that in here? So there's a discussion of this in the record at JA 150, 155, and 164. And it says here, the CEMS, which is an electronic measuring device, it says these are designed for measurements occurring during periods other than startup or shutdown, when emissions flows are stable and consistent. So EPA was really just looking for when are the emissions flows stable and consistent. And it said, you know, the best way that we can figure that out is when it seems like the boiler is fully functioning. And to figure that question out, we're going to look at when the air pollution control devices are engaged. So it's not that engagement of the air pollution control devices directly impacts measurement. It was just that this engagement was used as a proxy for when steady-state operations were achieved. Because that's when these emissions measurement devices can work effectively. You point to 155. Is there anywhere else? Oh, you said 150. 155, 150. I'm not sure I see that on 150. Okay, so here, 150, note 5. It says, neither NOx nor CEMS are calibrated at the levels found during startup or shutdown. They're calibrated between a range of values expected to be seen during non-startup or shutdown periods. What these instruments can provide is an indication or trend of emissions rather than actual values during startup. So that's why EPA looked to the drop, because it said that's still meaningful, but what's not meaningful is the actual levels that it's reporting. Other questions? Thank you. Did Council have any time left? Go ahead. I would like to address one bit of housekeeping really quickly to correct something I said earlier, and hopefully address three things that EPA said very quickly. First of all, I think I said earlier that granting reconsideration would deprive this court of jurisdiction as to the acid rain program conflict claim. I don't think that's right, actually. But if this court doesn't wish to decide that claim at this point, if it just remanded the startup rule to EPA to consider whether emissions can be measured, that would satisfy our concerns. You don't have any objection to that. I'm sorry? I said you don't have any objection to that. No, not at all. Addressing the connection between measurability and controls, the important point here is that EPA never made the required finding under 112H regarding measurability, and never made any assertion that controls can be connected to measurability until the final rule. And thus, petitioners couldn't have commented on the analysis regarding measurability and couldn't have commented on that finding until after the final rule was promulgated. The second thing is that EPA now says for the first time since its reconsideration denial that petitioners' objections aren't of central relevance because they didn't look to when controls are engaged. EPA didn't raise this argument in its brief, but in our opening brief, we rebutted that argument for why EPA was wrong. We looked at emission levels to show that controls were engaged and our best performers had engaged their sulfur dioxide controls at generation. And lastly, EPA claims that it did a best performer analysis in response to our comments. That's regardless of what EPA thought. Our comments did not say that it had to do a best performer analysis to establish the length of a work practice period. Our comments were focused on the substance of the work practices themselves, and that's at JA 104 through 105. And even if our comments did say what EPA said they did, that doesn't matter. Regardless, the important thing is that petitioners couldn't have possibly objected to the best performer analysis that did not exist during the comment period. Thank you. Roberts. Thank you. Thank you both. The case is submitted.
judges: Tatel, Pillard, Wilkins